IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

GABRIEL CANO,

         Petitioner,        No. CIV S-06-0558-LKK-TJB

    vs.

ANTHONY MALFI,

        Respondent.    <u>ORDER, FINDINGS AND RECOMMENDATIONS</u>

_____/

## I.  INTRODUCTION

Petitioner Gabriel Cano is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  For the following reasons, Petitioner's request for appointment of counsel is denied, and it is recommended that:  (1) Petitioner's August 16, 2006 stay-and-abeyance motion be denied; (2) Petitioner's September 16, 2008 request for what may be construed as either a stay-and-abeyance motion or a motion to amend be denied; and (3) habeas relief be denied.

## II.  PROCEDURAL HISTORY

The record reflects the following chronology of relevant proceedings:

1.  In 2003, a Sacramento County jury convicted Petitioner of two counts:  (1) attempted
    murder under Sections 664 and 187(a) of the California Penal Code; and (2) assault

with a firearm under Section 245(a)(2) of the California Penal Code.  Lodged Doc. 5, at 1; *see* Lodged Doc. 1.  "With respect to count one, the jury made special findings that [Petitioner] personally and intentionally discharged a firearm."  Lodged Doc. 5, at 1 (citation omitted); *see* Lodged Doc. 1.  "On both counts one and two, the jury found that [Petitioner] personally used a firearm, and inflicted great bodily."  Lodged Doc. 5, at 1 (citations omitted); *see* Lodged Doc. 1.  Petitioner is currently serving a sentence of twenty-five years to life, plus a seven year enhancement for discharge of a firearm causing great bodily injury.  Lodged Doc. 5, at 1; *see* Lodged Doc. 1.

2.  On May 27, 2004, Petitioner directly appealed his conviction to the California Court of Appeal, Third Appellate District.  *See* Lodged Doc. 2.  Petitioner raised three claims:  (1) the photographic lineup was unduly suggestive, and the trial court erred by failing to exclude the victim's photo identification and subsequent in-court identification of Petitioner; (2) the trial court erred by admitting gang evidence, over defense objection; and (3) cumulative error warrants reversal.  *Id.* at ii.

3.  On December 21, 2004, the Court of Appeal issued an unpublished opinion affirming the conviction and correcting a clerical error.  Lodged Doc. 5, at 16-17 ("As the People point out, while the trial judge correctly imposed a consecutive 25-year-to-life term in accordance with subdivision (d), she inadvertently cited Penal Code section 12022.53, *subdivision (b)*, an error which is reproduced in the abstract of judgment. . . . We shall order the abstract of judgment modified accordingly.").

4.  Stamped as docketed for February 3, 2005, Petitioner's petition for review was filed in the California Supreme Court.  *See* Lodged Doc. 6.  Petitioner raised the same three claims as in his direct appeal to the Court of Appeal.  *See* Lodged Doc. 6, at 1.

5.  On March 16, 2005, the California Supreme Court summarily denied the petition.  *See* Lodged Doc. 7.

6.  On March 16, 2006, Petitioner filed the original federal petition for writ of habeas

2

corpus.  *See* Pet'r's Pet., ECF No. 1.  Petitioner raised the same three claims as in his direct appeal to the Court of Appeal and California Supreme Court.  *See id.* at 3-4.

7. On May 16, 2006, Petitioner filed his first amended federal habeas petition.  *See* Pet'r's First Am. Pet., ECF No. 6.  Petitioner raised the same three claims as in his direct appeal to the Court of Appeal and California Supreme Court.  *See id.* at 2.

8. On June 20, 2006, Petitioner filed a motion in the Superior Court to modify the restitution fines.  Resp't's Renewed Opp'n Ex. H, at 59, ECF No. 30.

9. On June 22, 2006, Petitioner filed his second amended federal habeas petition.  *See* Pet'r's Second Am. Pet., ECF No. 9.  Petitioner raised the same three claims as in his direct appeal to the Court of Appeal and California Supreme Court.  *See id.* at 2.

10. On July 6, 2006, Petitioner filed a state habeas petition in Sacramento County Superior Court.  Petitioner argued:  (1) his due process rights were violated because his court appointed attorney was "not qualified," Resp't's Renewed Opp'n Ex. A, at 5; (2) his trial counsel rendered ineffective assistance for not investigating and cross examining witnesses properly regarding their identification of Petitioner, *id.* at 6; and (3) cumulative error of the prior two grounds warranted reversal.  *Id.* at 7.

11. On August 3, 2006, the Superior Court denied Petitioner's request for modification of restitution.  Resp't's Renewed Opp'n Ex. E, at 40.

12. On August 8, 2006, Petitioner filed a letter in federal court stating, in full:  "I am writing this breif [sic] letter to infor[m] the court that last month I filed an additional writ in Sacramento Superior Court in regards to additional claims I would like to bring up in my [federal habeas petition].  To my understanding I have to start in superior court and work my way up through the lower courts?  So I just wanted to let the court know because I'm not sure how this works!"  Pet'r's Letter 1, Aug. 8, 2006, ECF No. 12.

13. On August 16, 2006, Petitioner filed a letter in federal court requesting "that [his]

3

current appeal/writ be stayed until [he] can catch these new grounds up via the lower courts to [his] current writ." Pet'r's Req. 1, Aug. 16, 2006, ECF No. 13. According to Petitioner, "as of 6.6.06," he "filed an amemend [sic] complaint to [his] appeal in the Sacramento Superior Court[,] case number 06F06070." *Id. But see* Resp't's Renewed Opp'n Ex. A, at 3 (showing Petitioner filed Superior Court state habeas petition on July 6, 2006). The record does not show that Respondent filed a response to this letter.

14. On August 18, 2006, Petitioner filed his first of two notices of appeal in the Superior Court, appealing (1) the August 3, 2006 order denying Petitioner's request for restitution modification; and (2) "a writ of habeas corpus filed in the Sacramento [County] Superior Court . . . in which the writ was denied." Resp't's Renewed Opp'n Ex. E, at 41. *But see* Resp't's Renewed Opp'n Ex. B, at 23-24 (showing Superior Court did not deny habeas relief until August 29, 2006).[1]

15. On August 29, 2006, the Superior Court denied habeas relief. Resp't's Renewed Opp'n Ex. B, at 23-24.

16. Also on August 29, 2006, the Court of Appeal received Petitioner's first notice of appeal. Resp't's Renewed Opp'n Ex. F, at 46.

17. On September 13, 2006, Petitioner filed his second notice of appeal of his state habeas denial with the Superior Court. Resp't's Renewed Opp'n Ex. C, at 27.

18. On September 14, 2006, the Superior Court mailed a copy of the second notice of appeal to the Court of Appeal. *Id.*

19. On September 18, 2006, the Court of Appeal received Petitioner's second notice of appeal. *Id.*

---

[1] "Because no appeal lies from the denial of a petition for writ of habeas corpus, a prisoner whose petition has been denied by the superior court can obtain review of his claims only by the filing of a new petition in the Court of Appeal." *In re Clark*, 5 Cal. 4th 750, 767 n.7, 21 Cal. Rptr. 2d 509, 855 P.2d 729 (1993).

20. On October 4, 2006, Respondent filed an answer to the federal habeas petition. *See* Resp't's Answer, ECF No. 19.

21. On October 5, 2006, the Court of Appeal dismissed Petitioner's second notice of appeal, stating that "the order appealed from is nonappealable," with a citation to *In re Crow*, 4 Cal. 3d 613, 621 n.8, 94 Cal. Rptr. 254, 483 P.2d 1206 (1971).[2] *See* Resp't's Renewed Opp'n Ex. D, at 37.

22. On October 18, 2006, the Court of Appeal "appointed counsel to represent [Petitioner]" on his first notice of appeal. Resp't's Renewed Opp'n Ex. H, at 60; *see* Resp't's Renewed Opp'n Ex. F, at 46.

23. On November 9, 2006, Petitioner filed a traverse to Respondent's answer for the federal habeas petition. *See* Pet'r's Traverse, ECF No. 23.

24. On August 14, 2007, the Court of Appeal ruled on Petitioner's first notice of appeal, affirming the Superior Court's (1) August 3, 2006 order denying restitution modification; and (2) August 29, 2006 order denying habeas relief. Resp't's Renewed Opp'n Ex. H, at 61.

25. On October 24, 2007, Petitioner filed a habeas petition in the California Supreme Court. Petitioner raised two claims: (1) his due process and equal protection rights were violated because his court appointed attorney did not meet "Sacramento County's own established criteria;" and (2) his counsel was ineffective for failing to exclude certain evidence, and for failing to investigate or cross examine witnesses properly on their identification of Petitioner. Resp't's Renewed Opp'n Ex. I, at 66-67.

26. On November 4, 2007, the California Supreme Court received Petitioner's declaration

---

[2] In *In re Crowe*, the California Supreme Court noted "the [petitioner] cannot assert any right to appeal the denial of his petition for writ of habeas corpus. . . . Since the petitioner cannot appeal, his remedy lies in the petition for habeas corpus to a higher court." 4 Cal. 3d at 621 n.8, 94 Cal. Rptr. 254, 483 P.2d 1206.

explaining his habeas petition was "late" because he never received a decision from the Court of Appeal on his second notice of appeal.  Resp't's Renewed Opp'n Ex. J, at 76.

27. On April 16, 2008, the California Supreme Court denied Petitioner's habeas petition without comment or citation.  Resp't's Renewed Opp'n Ex. K, at 82.

28. On April 21, 2008, Petitioner filed a letter in federal court inquiring about "the status of his [federal habeas petition]," and about how "last year,[] [he] asked the court to stay" his petition "because [he] had a new ground that [he] was putting through the lower courts."  Pet'r's Letter 1, Apr. 21, 2008, ECF No. 24.  Petitioner "never received anything from the court."  *Id.*

29. On April 24, 2008, the civil docket for the instant case was modified to reflect that the Honorable Edmund F. Brennan, the assigned magistrate judge at the time, issued a response stating, "The court has no record that petitioner filed a request for stay and abeyance."  *See* Civil Docket for Case #: 2:06-cv-00558-LKK-TJB, ECF No. 24.  *But see* Pet'r's Req. 1, Aug. 16, 2006 ("I am requesting that my current appeal/writ be stayed until I can catch these new grounds up via the lower courts to my current writ if this is possible.").

30. On September 16, 2008, Petitioner filed a request for:  (1) what may be construed as either a stay-and-abeyance motion or a motion to amend; and (2) appointment of counsel.  *See* Pet'r's Req. 1, Sept. 16, 2008, ECF No. 25.

31. On October 6, 2008, Respondent filed an opposition to Petitioner's September 16, 2008 request.  *See* Resp't's Opp'n, ECF No. 26.

32. Petitioner did not file a reply to Respondent's opposition.

### III.  FACTUAL BACKGROUND[3]

On October 17, 2002, the victim Martin Ramirez had a couple of beers after work with coworkers and brothers Adan, Adelgundo and Felipe Netzahaul.  The four men then headed for the Netzahaul brothers' apartment in Rancho Cordova.  On the way, they stopped off at a nearby Circle K store and gas station.

Ramirez (who was wearing blue shorts and a white T-shirt) and Adelgundo went into the store, while the other two men remained out front in a blue car.  As Ramirez exited the store, [Petitioner] confronted him, making hand gestures and using the expressions "Northside" and "14." [Petitioner], a light-skinned Hispanic, was wearing a long-sleeved, hooded sweatshirt and black shorts.  The sweatshirt was described as red in color, although Felipe testified it was black and burgundy.  Ramirez, believing [Petitioner]'s behavior was gang-related, told him he had no connection with gangs.  [Petitioner] told Ramirez that he "don't got nothing on me.  But I'll come and get you.  Watch." [Petitioner] then ran across the street.

A cashier at the Circle K testified that on that same evening [Petitioner] had opened the door, peered in and said to someone inside the store, "I'm going to bang on this motherfucker."  Another store employee heard an agitated [Petitioner] say, "I'm going to [indistinguishable verb] on somebody tonight.  You watch me."

Following his encounter with [Petitioner] at the Circle K, Ramirez went with the Netzahaul brothers to their apartment, where they continued to drink beer and cooked dinner.  During this time, they looked through the window and saw [Petitioner] outside the apartment; he was screaming.

Around 7:00 p.m., just as it was starting to get dark, Adan and Adelgundo headed back to the store to buy more beer.  Ramirez walked out to the street to make sure they were okay.  [Petitioner] appeared on the street and again confronted Ramirez.  [Petitioner] said he was in a gang, that the street was "his territory," and that Ramirez did not belong there.  He told Ramirez to go back in the house "or I'll kill you."  Ramirez argued that the "street is free.  It's for everybody."  [Petitioner] disagreed, and again told Ramirez to return to his house.  [Petitioner] retreated a couple of steps, turned

---

[3] These facts are from the California Court of Appeal's opinion issued on December 21, 2004.  *See* Lodged Doc. 5, at 2-5 (footnotes omitted).  Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996, a determination of fact by the state court is presumed to be correct unless Petitioner rebuts that presumption with clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *see Moses v. Payne,* 555 F.3d 742, 746 n.1 (9th Cir. 2009); *Davis v. Woodford,* 384 F.3d 628, 638 (9th Cir. 2004).

around and pulled out a revolver.  He aimed it at Ramirez's chest and fired.  As Ramirez collapsed, [Petitioner] fired two more shots, which hit his left side.  [Petitioner] fired more shots in the direction of the Netzahauls' apartment building before fleeing.

Ramirez survived the shooting, but one of the bullets struck his spinal cord, paralyzing him from the waist down.  He testified at trial that the bullet was still lodged in his "spinal cord."

Five days after the shooting, Sacramento County Sheriff's Department Detective Jeffrey Mack visited Ramirez in the hospital.  After Ramirez gave a description of his assailant, Mack placed the photographs of four individuals in front of him.  The photos were taken from the records of the Department of Motor Vehicles.  Mack told Ramirez that the person responsible for the shooting may or may not be among those depicted in the photographs and that he was not obligated to pick anyone out.  As soon as Mack set down photograph number 3, depicting [Petitioner], Ramirez positively identified him as the shooter.

Ramirez repeated his identification of [Petitioner] at trial.  Felipe, who was in the immediate vicinity of the shooting, also testified that [Petitioner] was the assailant, although his pretrial identification was less certain.

[Petitioner] did not testify.  Other witnesses who were in the area of the shooting gave varying accounts of the incident, some that corroborated and some that conflicted with Ramirez's testimony.

The prosecution also called Luis Aguilar, a detective in the Sacramento County Sheriff's Department and a gang expert, who interpreted some of the gestures and phrases used by [Petitioner] immediately prior to the shooting.

## IV.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

An application for writ of habeas corpus by a person in custody under judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing *Engle v. Isaac*, 456 U.S. 107, 119 (1982)).  This petition for writ of habeas corpus was filed after the effective date of, and thus is subject to, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *Lindh v. Murphy*, 521 U.S. 320, 326 (1997); *see also Weaver v. Thompson*, 197 F.3d 359, 362 (9th Cir. 1999).  Under AEDPA, federal habeas corpus relief also is not available for any claim decided on the merits in

state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v. Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001).

In applying AEDPA's standards, the federal court must "identify the state court decision that is appropriate for our review." *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005). Where more than one state court has adjudicated Petitioner's claims, a federal habeas court analyzes the last reasoned decision. *Id.* (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991) ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground.")). A federal habeas court looks through ambiguous or unexplained state court decisions to the last reasoned decision to determine whether that decision was contrary to, or an unreasonable application of, clearly established federal law. *Bailey v. Rae,* 339 F.3d 1107, 1112-13 (9th Cir. 2003). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable-a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams v. Taylor*, 529 U.S. 362, 410 (2000)).

## V.  REQUESTS FOR REVIEW

Petitioner makes three requests:  (1) a stay-and-abeyance motion on August 16, 2006, Pet'r's Req. 1, Aug. 16, 2006; (2) what may be construed as either a stay-and-abeyance motion or a motion to amend on September 16, 2008, Pet'r's Req. 1, Sept. 16, 2008; and (3) appointment of counsel on September 16, 2006.  *Id.*

///

A.  First Request:  August 16, 2006 Stay-and-Abeyance Motion

On August 16, 2006, Petitioner requested that his "current appeal/writ be stayed until he can catch these new grounds up via the lower courts . . . ."  Pet'r's Req. 1, Aug. 16, 2006.  The prior magistrate judge, however, issued a response indicating, "The court has no record that petitioner filed a request for stay and abeyance."  *See* Civil Docket for Case #: 2:06-cv-00558-LKK-TJB, ECF No. 24.  Even if the request had been granted, the outcome would still be the same, i.e., Petitioner did not seek to amend the instant federal habeas petition timely to include his two additional claims.

1.  Legal Standard for Stay-and-Abeyance Motion

The Ninth Circuit recently clarified the procedures for analyzing stay-and-abeyance motions.  *See King v. Ryan*, 564 F.3d 1133, 1135-36 (9th Cir. 2009).  There are two approaches for analyzing a stay-and-abeyance motion, depending on whether the petition is mixed or fully exhausted.  *See id.*; *Jackson v. Roe*, 425 F.3d 654, 661 (9th Cir. 2005).  If the petitioner seeks a stay-and-abeyance order as to a mixed petition containing both exhausted and unexhausted claims, the request can be analyzed under the standard in *Rhines v. Weber*, 544 U.S. 269 (2005).  *See Jackson*, 425 F.3d at 661.  Under *Rhines*, in limited circumstances and upon the court's discretion, a petitioner can have his entire petition stayed and placed in abeyance while he exhausts the unexhausted claims in state court.  *See King*, 564 F.3d at 1135-36 (citing *Rhines*, 544 U.S. at 276-77).

If, however, the petition currently on file is fully exhausted, and petitioner seeks a stay-and-abeyance order to exhaust claims not raised in the current federal petition, the three-step approach set out in *Kelly v. Small*, 315 F.3d 1063 (9th Cir. 2003), *overruled on other grounds by Robbins v. Carey*, 481 F.3d 1143 (9th Cir. 2007), applies.  *See Jackson*, 425 F.3d at 661.  First, the petitioner amends his mixed petition to delete any unexhausted claims.  *See id.*  Second, the court would stay and hold in abeyance the amended, and now fully exhausted, petition while the petitioner exhausts the deleted claims in state court.  *See id.*  Third, the petitioner amends his

10

1    stayed petition to re-attach the now fully exhausted claims that he had previously deleted. *See id.*

2    (citing *Kelly*, 315 F.3d at 1070).

3           There are two important distinctions between *Rhines* and *Kelly*. First, under *Kelly*, a

4    petitioner must still amend to add his deleted claims within the original one year statue of

5    limitation set forth by AEDPA. *See King*, 564 F.3d at 1138-39; *see also* 28 U.S.C. § 2244(d)(1).

6    Under *Rhines*, however, a petitioner need not worry about the statute of limitations because his

7    unexhausted claims never leave federal court. *See King*, 564 F.3d at 1139, 1140 (citing *Rhines*,

8    544 U.S. at 277). The second difference between the two analyses is that *Rhines* requires a

9    showing of good cause, while *Kelly* does not. *See id.* at 1140. Even though *Kelly* does not

10   require a showing of good cause, the Ninth Circuit was clear that "district courts retain the same

11   degree of discretion they had before *Rhines* to implement the *Kelly* procedure." *Id.* at 1141.

12                        2.   Analysis of August 16, 2006 Stay-and-Abeyance Motion

13          Here, Petitioner did not seek to stay a mixed petition; he sought to hold all of his original

14   exhausted claims in abeyance while he exhausted his new claims. Because Petitioner tried to

15   stay a fully exhausted petition, *Kelly* provides the appropriate standard. As mentioned above, the

16   major hurdle Petitioner needed to overcome was amending his petition to include the newly

17   exhausted claims within the original one-year limitation period, which Petitioner failed to

18   accomplish. *See infra* Part V.B.3. Since Petitioner's additional claims are now fully exhausted,

19   it is recommended that Petitioner's August 16, 2006 stay-and-abeyance motion be denied as

20   moot. *See infra* Part V.B.1.

21          B.   Second Request:  September 16, 2008 Motion to Stay-and-Abey or to Amend

22          Second, Petitioner's September 16, 2008 request may be construed as either:  (1) a stay-

23   and-abeyance motion; or (2) a motion to amend. Pet'r's Req. 1, Sept. 16, 2008. Petitioner

24   writes:  "This motion to the court is to request a stay of abeyance and hold the status of my

25   petition so that I may amend my complaint on the two extra grounds that have already been

26   exhausted in the lower courts." *Id.* For the following reasons, Petitioner's motion, whether

                                                    11

1    construed as a stay-and-abeyance motion or a motion to amend, fails.

2                    1.  Analysis of Stay-and-Abeyance Motion

3            Here, the instant petition consists of fully exhausted claims.  And, as Petitioner admits,

4    the claims he seeks to add are also fully exhausted.  *Id.* at 1-2.  Petitioner's request to hold the

5    proceedings in abeyance should be denied as moot.

6            Petitioner's request, however, may also be interpreted as a motion to amend.  *See Haines*

7    *v. Kerner*, 404 U.S. 519, 520 (1972) (requiring district courts to liberally construe pro se

8    petition); *Jackson*, 425 F.3d at 661 (noting third step under *Kelly* requires petitioner to amend

9    fully exhausted petition to add fully exhausted claims).  To the extent that Petitioner's request is

10   construed as a motion to amend, that request also fails.

11                    2.  Legal Standard for Motion to Amend

12           A petitioner may amend a petition for writ of habeas corpus once "as a matter of course,"

13   and without leave of court, before a response has been filed under Federal Rule of Civil

14   Procedure 15(a), as applied to habeas corpus actions pursuant to 28 U.S.C. § 2242 and Rule 11 of

15   the Federal Rules Governing Section 2254 Cases.  *Calderon v. U.S. District Court* (*Thomas*), 144

16   F.3d 618, 620 (9th Cir. 1998); *Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995).  Under Rule

17   15(a), once a responsive pleading has been filed, a petitioner must seek leave of court before

18   being allowed to amend.  Fed. R. Civ. P. 15(a); *see also Anthony v. Cambra*, 236 F.3d 568, 577

19   (9th Cir. 2000).  "Although, under the rule, 'leave shall be freely given when justice so requires,'

20   the district court may consider whether there is any evidence of 'undue delay, bad faith or

21   dilatory motive' with respect to the filing of the amendment when determining whether leave

22   should be granted."  *Anthony*, 236 F.3d at 577.  In deciding whether to allow an amendment, the

23   Court may consider "bad faith, undue delay, prejudice to the opposing party, futility of the

24   amendment, and whether the party has previously amended his pleadings."  *Bonin*, 59 F.3d at

25   844-45 (applying Rule 15(a) in habeas case).

26   ///

                                                      12

3.   Analysis of Motion to Amend

Petitioner seeks to add "two extra grounds" already "exhausted in the lower courts." Pet'r's Req. 1, Sept. 16, 2008.  In his first additional ground, Petitioner claims he was denied due process and equal protection rights because his court appointed attorney was not experienced enough to handle an attempted murder case.  Resp't's Opp'n Ex. A, at 5 ("I was not provided effective counsel according to Sacramento County's own established criteria.  And I was not provided at the established criterial level afforded to other felony defendants charged with the same or similar crimes . . . .").  In his second additional ground, Petitioner asserts an ineffective assistance of counsel claim.  *Id.* at 6.  According to Petitioner, trial counsel "failed to exclude cumulative evidence that prior to or after the shooting," Petitioner "was seen in the area, a fact admitted since [Petitioner] live[d] in the area."  *Id.*  Petitioner also alleges trial counsel "failed to cross-examine [a] key prosecution witness about several previous failures to identify [Petitioner] as the shooter or previous identifications of persons other then [sic] [Petitioner] as being the shooter."  *Id.*  However, Petitioner's motion to amend, as construed, is futile because:  (1) it is untimely; and (2) it does not relate back to the original habeas petition.

a.   Statute of Limitations

The instant petition is governed by AEDPA.  AEDPA imposes a one-year period of limitation on petitioners seeking to file a federal petition for writ of habeas corpus.  28 U.S.C. § 2244(d)(1).  Under 28 U.S.C. § 2244(d)(1)(A)-(D), the limitation period shall run from the latest of:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly

13

1                recognized by the Supreme Court and made retroactively
               applicable to cases on collateral review; or

2

3                (D) the date on which the factual predicate of the claim or claims
               presented could have been discovered through the exercise of due
               diligence.

4

5       In most cases, the limitations period begins running on the date that the petitioner's direct

6 review became final.  "The period of 'direct review' in 28 U.S.C. § 2244(d)(1)(A) includes the

7 period within which a petitioner can file a petition for a writ of certiorari from the United States

8 Supreme Court, whether or not the petitioner actually files such a petition."  *Bowen v. Roe*, 188

9 F.3d 1157, 1159 (9th Cir. 1999).  "Therefore, when a petitioner fails to seek a writ of certiorari

10 from the United States Supreme Court," AEDPA's one-year limitations period begins to run on

11 the date the ninety-day period expires.  *Id.*

12       Here, the California Supreme Court denied the petition for review on March 16, 2005.

13 *See* Lodged Doc. 7.  Petitioner had until June 13, 2005 to file a petition for certiorari in the

14 United States Supreme Court.  *Bowen*, 188 F.3d at 1160 (9th Cir. 1999) (finding, where

15 California Supreme Court denied petition for review on January 22, 1997, petitioner had until

16 April 22, 1997 to file petition for certiorari, and petitioner "therefore had until April 22, 1998, to

17 file his habeas petition").  Petitioner had until June 13, 2006, absent applicable tolling, to file his

18 federal petition for writ of habeas corpus.  *Id.*

19       Petitioner filed his first federal habeas petition on March 16, 2006, within the one-year

20 statute of limitations, which did not include the "two extra grounds" Petitioner seeks to add.

21 Pet'r's Req. 1, Sept. 16, 2008.  Rather, Petitioner sought to amend his petition, for the third time,

22 to include these two grounds on September 16, 2008, over two years beyond the due date.

23 Absent any applicable tolling or relation back, the two additional grounds are barred by the

24 statute of limitations.

25                     b.  Statutory Tolling

26       Under 28 U.S.C. § 2244(d)(2), the "time during which a properly filed application for

1   State post-conviction or other collateral review with respect to the pertinent judgment or claim is

2   pending shall not be counted toward" the one year limitation period.  In other words, the statute

3   of limitations is tolled during the pendency of any "properly filed" collateral attack in the state

4   courts.  *Artuz v. Bennett*, 531 U.S. 4, 7-8 (2000).  The Ninth Circuit has held that "the statute of

5   limitations is tolled from the time the first state habeas petition is filed until the California

6   Supreme Court rejects the petitioner's final collateral challenge."  *Nino v. Galaza*, 183 F.3d

7   1003, 1006 (9th Cir.1999).  The AEDPA one-year limitations period would be tolled during the

8   period in which Petitioner was properly pursuing his state remedies.  Tolling begins "from the

9   time the first state habeas petition is filed until the California Supreme Court rejects the

10  petitioner's final collateral challenge[,]" but the statute of limitations is not tolled "from the time

11  a final decision is issued on direct appeal and the time the first state collateral challenge is filed

12  because there is no case 'pending' during that interval."  *Id.*

13          Here, Petitioner had until June 13, 2006, to amend his federal habeas petition to include

14  the two additional claims.  Petitioner did not file his first state habeas petition containing those

15  additional claims until July 6, 2006, in the Superior Court, after the statute of limitations

16  expired.[4]  Resp't's Renewed Opp'n Ex. A, at 3.  Even then, in his Superior Court habeas petition,

17  Petitioner only raised a due process violation as to his claim that trial counsel was "not

18  qualified;" Petitioner failed to raise an equal protection claim regarding the qualifications of his

19  trial counsel until his California Supreme Court habeas petition, filed on October 24, 2007.[5]

20  ───────────────

21          [4] The proof of service page is dated June 22, 2006.  Resp't's Renewed Opp'n Ex. A, at
    18.  The Ninth Circuit applies the mailbox rule to filings by state prisoners.  Under that rule,
22  courts deem a state prisoner's pleading filed when a prisoner hands the petition over to prison
    authorities for mailing to the court.  *See Huizar v. Carey*, 273 F.3d 1220, 1223 (9th Cir. 2001)
23  ("A prisoner who delivers a document to prison authorities gets the benefit of the prison mailbox
    rule, so long as he diligently follows up once he has failed to receive a disposition from the court
24  after a reasonable period of time.").  Even under the mailbox rule, Petitioner's first state habeas
    petition was filed after the statute of limitations expired.

25

26          [5] "[T]he California Constitution provides that each of the three levels of state courts --
    Superior Courts, Courts of Appeal, and the Supreme Court -- has 'original jurisdiction in habeas

                                                    15

1    *Compare id.* at 5 (Superior Court habeas petition), *with* Resp't's Renewed Opp'n Ex. I, at 66

2    (California Supreme Court habeas petition).  Similarly, in Petitioner's Superior Court habeas

3    petition, Petitioner only alleged counsel was ineffective for failing to investigate and cross

4    examine witnesses; Petitioner did not assert counsel was deficient for "fail[ing] to exclude

5    cumulative evidence" until his California Supreme Court habeas petition.  *Compare* Resp't's

6    Renewed Opp'n Ex. A, at 6, *with* Resp't's Renewed Opp'n Ex. I, at 67.

7         Although Petitioner filed his original federal habeas petition on March 16, 2006, the

8    filing of a federal habeas petition does not toll the statute of limitations.  *Duncan v. Walker*, 533

9    U.S. 167, 181-82 (2001) ("We hold that an application for federal habeas corpus review is not an

10   'application for State post-conviction or other collateral review' within the meaning of 28 U.S.C.

11   § 2244(d)(2).  Section 2244(d)(2) therefore did not toll the limitation period during the pendency

12   of [the] first federal habeas petition.").  Petitioner's first state habeas petition was filed after

13   AEDPA's one-year statute of limitations had already expired, and statutory tolling does not apply

14   in this case.  *See Ferguson v. Palmateer*, 321 F.3d 820, 823 (9th Cir. 2003) (holding tolling

15   provision does not restart running of limitations period if it expired before state collateral review

16   began); *Green v. White*, 223 F.3d 1001, 1003 (9th Cir. 2000); *see also Nino*, 183 F.3d at 1006

17   (determining statutory tolling does not apply to period between end of direct review and

18   beginning of state collateral review).  Unless equitable tolling applies, Petitioner's two additional

19   claims are time-barred.

20   ///

21   _____

22   corpus proceedings.'"  *Gaston v. Palmer*, 387 F.3d 1004, 1010 (9th Cir. 2004) (quoting Cal.
     Const. art. VI, § 10), *amended for other reasons by* 447 F.3d 1165 (9th Cir. 2006).  A California

23   prisoner may file an original habeas petition in each of the three courts, and each court may
     exercise its original jurisdiction.  *See*, *e.g.*, *In re Clark*, 5 Cal. 4th 750, 760-62, 21 Cal. Rptr. 2d

24   509, 855 P.2d 729 (1993) (noting petitioner's first habeas application was filed in California
     Supreme Court).  When the state's higher courts issue postcard denials, i.e., decisions without

25   comment or citation, the Ninth Circuit construes those denials as decisions on the merits.
     *Gaston*, 387 F.3d at 1013 (citing *Hunter v. Aispuro*, 982 F.2d 344, 348 (9th Cir. 1992)); *see In re*

26   *Clark*, 5 Cal. 4th at 769 n.9, 21 Cal. Rptr. 2d 509, 855 P.2d 729 (noting "summary denial" of
     state habeas petition "does not mean that the court has not considered the merits of the claims").

c.  Equitable Tolling

The one-year limitations period can be equitably tolled because Section 2244(d) is a statute of limitations and not a jurisdictional bar.  *Calderon v. U.S. District Court* (*Beeler*), 128 F.3d 1283, 1288 (9th Cir. 1997), *overruled on other grounds by Calderon v. U.S. District Court* (*Kelly*), 163 F.3d 530, 540 (9th Cir. 1998).  "When external forces, rather than a petitioner's lack of diligence, account for the failure to file a timely claim, equitable tolling of the statute of limitations may be appropriate."  *Miles v. Prunty*, 187 F.3d 1104, 1107 (9th Cir.1999).  Equitable tolling will not be available in most cases because extensions of time should be granted only if "extraordinary circumstances beyond [a] prisoner's control make it impossible to file a petition on time."  *Beeler*, 128 F.3d at 1288 (citation and internal quotation marks omitted).  This high bar is necessary to effectuate AEDPA's statutory purpose of encouraging prompt filings in federal court.  *See Carey v. Saffold*, 536 U.S. 214, 226 (2002).  The petitioner bears the burden of showing that equitable tolling applies and must show:  "(1) that he has been pursuing his rights diligently[;] and (2) that some extraordinary circumstance stood in his way."  *Raspberry v. Garcia*, 448 F.3d 1150, 1153 (9th Cir. 2006) (citing *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)).  Whether equitable tolling is in order turns on an examination of detailed facts.  *Lott v. Mueller*, 304 F.3d 918, 923 (9th Cir. 2002).

Here, Petitioner fails to demonstrate he was pursuing his rights diligently, or that some extraordinary circumstance stood in his way.  Petitioner filed his first state habeas petition on July 6, 2006, after the statute of limitations expired.  Resp't's Renewed Opp'n Ex. A, at 3.  In Petitioner's August 16, 2006 stay-and-abeyance motion, Petitioner only vaguely alleged that "access to the law library is limited."  Pet'r's Req. 1, Aug. 16, 2006.  Petitioner does not establish that he made any timely or proper requests for access to the law library.  Petitioner does not show exactly what legal materials he actually needed during the relevant period to prepare and file his petition in a timely manner, and that his requests for access and legal materials were denied.  Limited or inadequate access to the law library does not constitute an extraordinary circumstance

17

1   warranting equitable tolling. *See, e.g.*, *Baker v. Norris*, 321 F.3d 769, 771 (8th Cir.)

2   (determining prison policy limiting inmates to two hours in prison library and requiring them to

3   sign up in advance did not warrant equitable tolling), *cert. denied*, 539 U.S. 918 (2003); *Frye v.*

4   *Hickman*, 273 F.3d 1144, 1146 (9th Cir. 2002) ("[W]e rejected the argument that lack of access

5   to library materials automatically qualified as grounds for equitable tolling . . . ."); *Miller v.*

6   *Marr*, 141 F.3d 976, 978 (10th Cir. 1998) (finding petitioner's alleged lack of access to law

7   library materials and resulting unawareness of limitation period until it was too late did not

8   warrant equitable tolling); *Rosati v. Kernan*, 417 F. Supp. 2d 1128, 1132 (C.D. Cal. 2006)

9   ("[P]etitioner's complaints about limited access to the law library and legal materials at various

10   state prisons and occasional prison lockdowns do not warrant equitable tolling since petitioner

11   has not shown any causal connection between these events and his failure to timely file his

12   habeas corpus petition."); *Corrigan v. Barbery*, 371 F. Supp. 2d 325, 330 (W.D.N.Y. 2005) ("In

13   general, the difficulties attendant on prison life such as transfers between facilities, solitary

14   confinement, lockdowns, restricted access to the law library, and an inability to secure court

15   documents, do not by themselves qualify as extraordinary circumstances."); *Lindo v. LeFever*,

16   193 F. Supp. 2d 659, 663 (E.D.N.Y. 2002) ("Transfers between prison facilities, solitary

17   confinement, lockdowns, restricted access to the law library and an inability to secure court

18   documents do not qualify as extraordinary circumstances."); *United States v. Van Poyck*, 980 F.

19   Supp. 1108, 1111 (C.D. Cal. 1997) (holding inability to secure copies of transcripts from court

20   reporters and lockdowns at prison lasting several days and allegedly eliminating access to law

21   library were not extraordinary circumstances for equitable tolling); *cf. Lindquist v. Idaho State*

22   *Bd. of Corr.*, 776 F.2d 851, 858 (9th Cir. 1985) ("[T]he Constitution does not guarantee a

23   prisoner unlimited access to a law library.").

24         Petitioner then waited more than a year to follow up with the Court of Appeal on the

25   status of his second notice of appeal.  On September 18, 2006, Petitioner filed his second notice

26

1    of appeal, and Petitioner did not inquire about its status until October 15, 2007.[6]  *Compare*

2    Resp't's Renewed Opp'n Ex. C, at 27, *with* Resp't's Renewed Opp'n Ex. J, at 78.  Petitioner

3    explained his California Supreme Court habeas petition was "late" because he never received the

4    Court of Appeal's decision on his second notice of appeal, as Petitioner was "transferred 3

5    times," and Court of Appeal's decision "must of [sic] got lost in the mail somehow."  Resp't's

6    Renewed Opp'n Ex. J, at 76.  *But see* cases cited *supra* p. 18.  Unless the amendments sought by

7    Petitioner relate back to the date of the filing of the original federal habeas petition, they are

8    untimely by over a year.

9                                    d.  Relation Back

10            Amendments made after the statute of limitations has run relate back to the date of the

11   original pleading only if the amended pleading arises out of the same "conduct, transaction or

12   occurrence."  FED. R. CIV. P. 15(c)(2).  In *Mayle v. Felix*, the Supreme Court held that in habeas

13   cases, the phrase "conduct, transaction or occurrence" should not be defined so broadly as to

14   allow relation back of a new claim that stems from the petitioner's "trial conviction or sentence."

15   545 U.S. 644, 656 (2005).  The Supreme Court reasoned that "[u]nder that comprehensive

16   definition, virtually any new claim introduced in an amended petition will relate back."  *Id.* at

17   656-57.  Instead, the Supreme Court held that "conduct, transaction or occurrence" in federal

18   habeas cases should be defined less broadly, and "allow relation back only when the claims

19   added by amendment arise from the same core facts as the timely filed claims, and not when the

20   new claims depend upon events separate in 'both time and type' from the originally raised

21   episodes."  *Id.* at 657.

22            Here, the new claims Petitioner wants to add by amending the petition do not relate back

23   to the claims in the original petition.  As stated earlier, Petitioner's original petition consists of

24   three claims:  (1) the photographic lineup was unduly suggestive, Pet'r's Second Am. Pet. Ex. A,

25   _____

26        [6] *See supra* note 4.

at 23; (2) the trial court erred by admitting, over Petitioner's objection, gang evidence, *id.* at 9; and (3) cumulative error warrants reversal.  *Id.*  In his new claims, Petitioner alleges:  (1) his due process and equal protection rights were violated because trial counsel was not experienced enough, Resp't's Opp'n Ex. A, at 5; and (2) his right to effective assistance of counsel was violated because trial counsel failed to exclude evidence that Petitioner was in the area, and failed to investigate and cross-examine a prosecution witness.  *Id.* at 6.

None of the new claims share a common core of operative facts with the claims contained in the original petition.  *Compare Rhoades v. Henry* (*Haddon*), 598 F.3d 511, 519-20 (9th Cir. 2010) (affirming denial of leave to amend petition where new claims arising out of "alleged misconduct of the prosecutors . . . based on testing done by the FBI laboratory" did not relate back to original claims involving "police questioning at the time of [petitioner's] arrest, jailhouse informant testimony, and judicial bias"), *and Hebner v. McGrath*, 543 F.3d 1133, 1138-39 (9th Cir. 2008) (affirming denial of leave to amend petition where later claim "directed at the jury instructions given by the trial court" was "not sufficiently related" to original claim involving "evidence admitted at trial"), *with Valdovinos v. McGrath*, 598 F.3d 568, 574-75 (9th Cir. 2010) (finding *Brady* claim in amended petition related back to *Brady* claim in original petition where revision added newly discovered evidence that had not been disclosed by prosecutor; both original and amended claims were "of the same type" in that both pertained to suppressed exculpatory evidence government had in its file), *and id.* at 575-76 (determining ineffective assistance of counsel claim in amended petition related back to ineffective assistance of counsel claim in original petition, where both claims pertained to counsel's alleged failure to adequately investigate suppressed exculpatory evidence upon learning of it, and amended claim "simply adds more evidence that counsel did not uncover").

In sum, Petitioner's amendments are futile because his new claims are barred by the statute of limitations; Petitioner is not entitled to statutory or equitable tolling; and the new claims do not relate back to the claims alleged in the original federal habeas petition.  It is

1    recommended that Petitioner's September 16, 2008 request for what may be construed as either a

2    stay-and-abeyance motion or a motion to amend be denied.

3        C.  Third Request:  Appoint Counsel

4        Third, Petitioner requests appointment of counsel in further litigation of this action.

5    Pet'r's Req. 1, Sept. 16, 2008.  The Sixth Amendment right to counsel does not apply in habeas

6    corpus actions.  *See Knaubert v. Goldsmith*, 791 F.2d 722, 728 (9th Cir. 1986).  A district court,

7    however, may appoint counsel to represent a habeas petitioner whenever "the court determines

8    that the interests of justice so require," and such person is financially unable to obtain

9    representation.  18 U.S.C. § 3006A(a)(2)(B).  The decision to appoint counsel is within the

10   district court's discretion.  *See Chaney v. Lewis*, 801 F.2d 1191, 1196 (9th Cir. 1986).  Courts

11   have made appointment of counsel the exception rather than the rule by limiting it to:  (1) capital

12   cases; (2) cases that turn on substantial and complex procedural, legal, or mixed legal and factual

13   questions; (3) cases involving uneducated or mentally or physically impaired petitioners; (4)

14   cases likely to require the assistance of experts either in framing or in trying the claims; (5) cases

15   in which the petitioner is in no position to investigate crucial facts; and (6) factually complex

16   cases.  *See generally* 1 J. LIEBMAN & R. HERTZ, FEDERAL HABEAS CORPUS PRACTICE AND

17   PROCEDURE § 12.3b, at 383-86 (2d ed. 1994).  Appointment is mandatory only when the

18   circumstances of a particular case indicate that appointed counsel is necessary to prevent due

19   process violations.  *See Chaney*, 801 F.2d at 1196; *Eskridge v. Rhay*, 345 F.2d 778, 782 (9th Cir.

20   1965).

21       Appointment of counsel is not warranted in this case.  Petitioner's claims are typical

22   claims that arise in habeas petitions and are not especially complex.  This is not an exceptional

23   case that would warrant representation on federal habeas review.  Petitioner's request for

24   appointment of counsel is denied.

25       This matter is now ready for decision.  For the following reasons, it is recommended that

26   habeas relief be denied.

1                                  VI.  CLAIMS FOR REVIEW

2         The petition for writ of habeas corpus sets forth three grounds for relief:  (1) "[t]he

3 [s]howup [w]as [u]nduly [s]uggestive," Pet'r's Second Am. Pet. Ex. A, at 36, and "the trial court

4 denied [Petitioner] his right to due process when it failed to exclude the victim's photo

5 identification and subsequent in-court identification of [Petitioner]," *id.* at 9; (2) Petitioner "was

6 denied due process and a fair trial when the trial court, over defense objection, admitted gang

7 evidence," *id.*; and (3) "cumulative error warrants reversal."  *Id.*

8         A.  Ground One:  Unduly Suggestive Lineup

9         Petitioner argues the photographic lineup shown to the victim was unduly suggestive

10 because:  (1) Petitioner's "photograph is clearly darker than the others," and Petitioner "is by far

11 the heaviest individual pictured in the lineup," *id.* at 39; (2) "there were only four . . .

12 photographs, total, in the lineup," *id.*; and (3) the victim was "heavily medicated when he

13 viewed" the lineup.  *Id.* at 40.  Petitioner also contends the identification testimony was

14 unreliable because:  (1) the victim "did not have an adequate opportunity to view the shooter"

15 since "the entire altercation happened . . . in a matter of 1-3 minutes, . . . it was dusk," and the

16 victim "was not face-to-face with the shooter for any significant period of time," *id.* at 43; (2) the

17 victim's "degree of attention was clearly lacking given the fact he was intoxicated," *id.* at 44; (3)

18 the victim "did not give the authorities a description of the shooter that matched that of

19 [Petitioner],"[7] *id.* at 44; (4) the victim was "plainly not certain of his pretrial identification" of

20 Petitioner,[8] *id.* at 45; and (5) "at least five (5) days had passed between the time of the crime and

21 the confrontation."  *Id.*

22

23         [7] According to Petitioner, "[p]rior to the lineup, [the victim] told Detective Mack the
    shooter weighed between 140 and 150 pounds.  (R.T. pp. 169-170.)  [Petitioner] clearly weighs
24     much more than 150 pounds.  (*See*, C.T. p. 4.)"  Pet'r's Second Am. Pet. Ex. A, at 44.

25         [8] Petitioner argues that "[a]lthough [the victim] initially stated, 'I'm positive,' he
    immediately retreated from this statement by saying[,] 'His face is a little thinner now[,]' and
26     'That looks like him.'"  Pet'r's Second Am. Pet. Ex. A, at 45.

1.  State Court Decision

The California Court of Appeal rejected this claim, stating, in part:

> We reject the notion that the lineup was unduly suggestive because
> it contained "only" four photographs.  There is no minimum
> number of photographs a victim must be shown in order to satisfy
> due process.  ([*People v.*] *Ochoa*, [(1998)] 19 Cal.4th [353,] 413[,]
> [79 Cal. Rptr. 2d 408, 966 P.2d 442] [even a ""single person
> showup" is not inherently unfair""].)  *United States v. Sanchez*
> (10th Cir. 1994) 24 F.3d 1259, 1262-1263, cited by[Petitioner],
> simply makes the point that the smaller the number of pictures in
> the array, the more a court should scrutinize the lineup for
> irregularities which could cause the accused to stand out.  Our
> review of the photographs used by Detective Mack reveals that all
> of the individuals depicted in the lineup are Hispanic males in their
> late teens or early twenties.  All are wearing a solid color shirt and
> none has distinguishing features such as tattoos or scars.  In light of
> the substantial similarities in the photographs, especially when
> considered along with Mack's cautionary admonition that the
> person responsible may or may not be present in the lineup, the fact
> that four instead of six photographs were shown to [the victim]
> merits little weight.
>
> Nor do we accord significance to the fact that [Petitioner's] photo
> appears darker than the others.  The shaded condition of the picture
> is clearly the result of insufficient lighting conditions.  We have not
> been cited to any case that holds that such a technical attribute
> constitutes suggestiveness for purposes of analyzing a lineup for
> constitutional sufficiency.  We reject the notion that a crime victim
> is more likely to single out a person as the perpetrator based on
> differences in the darkness or lightness of his or her photograph.
>
> [Petitioner's] assertion that he is "by far the heaviest individual" in
> the lineup thus rendering him "the 'oddball'" in the group, is
> inaccurate.  Another photograph in the group shows a man in
> approximately the same weight range.  In any event, "there is no
> requirement that a defendant in a lineup, either in person or by
> photo, be surrounded by others nearly identical in appearance."
> (*People v. Brandon*, [(1995)] 32 Cal.App.4th [1033,] 1052[,] [38
> Cal. Rptr. 2d 751].)  [Petitioner's] claim is further undermined by
> the fact that [the victim's] identification was made *despite*
> [Petitioner's] heavy-set appearance, not because of it.  At the time
> he made the identification, [the victim] told Detective Mack, I'm
> positive.  His face is a *little thinner now*, but that looks like him."
> (Italics added.)
>
> [Petitioner's averment that the lineup was tainted because it was
> presented to [the victim] while he was in a vulnerable state due to
> medication and recovery from injuries is unpersuasive.  An
> identification procedure is unfair if it ""suggests in advance of

> identification by the witness the identity of the person suspected by the police.'" (*People v. Hunt* (1977) 19 Cal.3d 888, 894[,] [140 Cal. Rptr. 651, 568 P.2d 376].)  While the victim's impaired physical and mental condition at the time of the identification might be a factor a jury could consider in assessing its reliability, it has no impact on the *suggestiveness of the identification procedure* employed by the police, and therefore cannot support [Petitioner's] due process claim.  Moreover, [Petitioner] cites no evidence that [the victim] was less than coherent when he identified [Petitioner].  On the contrary, his selection of [Petitioner's] photograph was instantaneous and made without hesitation.

> Finally, the fact that [the victim] answered "that looks like him" after initially stating he was "positive" that the man in photograph number 3 was the one who shot him, is of no moment.  There is no requirement that a victim exhibit continuous and unwavering certainty in order to render an out-of-court identification admissible.

> Inasmuch as we find that the lineup was not unduly suggestive, our due process inquiry ends, and we need not consider the question of whether [the victim's] pretrial identification was nevertheless reliable under the totality of the circumstances.  (*Ochoa, supra*, 19 Cal.4th at p. 412.)  The trial court did not err in failing to suppress [the victim's] pretrial identification and resulting in-court identification of [Petitioner].

Lodged Doc. 5, at 7-10.

        2.  Legal Standard for Unduly Suggestive Lineup Claim

The Due Process Clause of the United States Constitution prohibits the use of identification procedures which are "unnecessarily suggestive and conducive to irreparable mistaken identification."  *Stovall v. Denno*, 388 U.S. 293, 302 (1967), *overruled on other grounds by Griffith v. Kentucky*, 479 U.S. 314, 326 (1987) (discussing retroactivity of rules propounded by Supreme Court).  To determine the admissibility of identification testimony, courts employ a two-step analysis.  *United States v. Love*, 746 F.2d 477, 478 (9th Cir. 1984).

The first step focuses on whether the identification procedure was impermissibly suggestive.  *Id.* (citing *Manson v. Brathwaite*, 432 U.S. 98, 107 (1977); *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972)).  A suggestive identification violates due process if it was unnecessary or "gratuitous" under the circumstances.  *Biggers*, 409 U.S. at 198.  An identification procedure is

1    suggestive where it "[i]n effect . . . sa[ys] to the witness, '*This* is the man.'"  *Foster v. California*,

2    394 U.S. 440, 443 (1969).  Each case must be considered on its own facts, and whether due

3    process was violated depends on the totality of the circumstances surrounding the confrontation.

4    *Simmons v. United States*, 390 U.S. 377, 383 (1968); *see also Stovall*, 388 U.S. at 302.  If the

5    court finds that a challenged procedure is not impermissibly suggestive, the due process inquiry

6    ends.  *United States v. Bagley*, 772 F.2d 482, 493 (9th Cir. 1985) ("Having concluded that the . . .

7    show-up was a legitimate identification procedure, we need not reach the question whether the

8    [witness's] identification was reliable under the test enunciated in *Biggers*."), *cert. denied*, 475

9    U.S. 1023 (1986).

10         If the identification procedure was impermissibly suggestive, a reviewing court proceeds

11   to the second step and determines whether, under the totality of the circumstances, an

12   identification that resulted from it was nevertheless reliable.  *Biggers*, 409 U.S. at 198.  Factors

13   to be considered in evaluating the reliability of an identification after a suggestive procedure

14   include:  (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the

15   witness's degree of attention paid to the criminal; (3) the accuracy of the witness's prior

16   description of the criminal; (4) the level of certainty demonstrated by the witness at the time of

17   the confrontation; and (5) the length of time between the crime and the confrontation.  *Id.* at

18   199-200; *Torres v. City of Los Angeles*, 548 F.3d 1197, 1209 (9th Cir. 2008), *cert. denied*, ___

19   U.S. ___, 129 S. Ct. 1995 (2009).

20              3.  Analysis of Unduly Suggestive Lineup Claim

21         First, Petitioner's argument that his lineup was unduly suggestive because his photograph

22   is "clearly darker," and he "is by far the heaviest individual pictured," is unpersuasive.  Pet'r's

23   Second Am. Pet. Ex. A, at 39.  The Ninth Circuit has consistently declined to hold that minor

24   differences between suspects' photographs render a lineup impermissibly suggestive.  In *Mitchell

25   v. Goldsmith*, 878 F.2d 319, 323 (9th Cir. 1989), the Ninth Circuit rejected a habeas petitioner's

26   claim that pretrial identification procedures were unduly suggestive where he was "the only

25

person in the lineup who was photographed against a blue background; four of the seven

individuals in the photographic lineup had lighter complexions than his; and [his] photo was the

only photo with a 1981 date."  Likewise, in *United States v. Collins*, 559 F.2d 561, 563 (9th Cir.

1977), the court rejected the same argument where the petitioner claimed that "(1) three of the six

Negro male individuals depicted appeared to be significantly younger than [the petitioner]; (2)

only [the petitioner] and two others appear to have afro-style haircuts; and (3) only [the

petitioner] appears to have a beard."  *See also United States v. Burdeau*, 168 F.3d 352, 357 (9th

Cir. 1999) (finding photo array not suggestive where defendant's picture "was placed in the

center of the array, was darker than the rest, and was the only one in which the eyes were closed,"

and citing cases for proposition that "such insubstantial differences . . . do not in themselves

create an impermissible suggestion that the defendant is the offender"); *United States v. Johnson*,

820 F.2d 1065, 1073 (9th Cir. 1987) (holding photographic array not unduly suggestive where

defendant's photograph was hazier than others); *United States v. Sambrano*, 505 F.2d 284, 286

(9th Cir. 1974) (determining photographic array not unduly suggestive where defendant's

photograph was darker and clearer than others); *United States v. Lincoln*, 494 F.2d 833, 839 (9th

Cir. 1974) (finding photographic array not unduly suggestive where defendant's color driver's

license photograph was shown with black and white copies of driver's licenses or other types of

photos).

Second, Petitioner's argument that his lineup was unduly suggestive because it contained

only four photographs, rather than the standard six photographs, fails.  In *Bagley*, the Ninth

Circuit found that a "one-on-one show-up," where a witness identified the petitioner while the

petitioner was "seated in a police car, handcuffed and surrounded by law enforcement," was "a

legitimate identification procedure."  772 F.2d at 492.  The Ninth Circuit further held that a

photographic procedure, where witnesses were shown two photographic displays, was not unduly

suggestive.  *Id.* at 493.  The first "group was comprised of six mug shots of black males[,]" and

the petitioner's "mug shot was included in this set."  *Id.*  "The second group consisted of two

surveillance photographs," and the FBI agent "believed that one of the bank surveillance photographs was a picture of [Petitioner]." *Id.* The Ninth Circuit " examined both sets of photographs and conclude[d] that the content of photographic display was not impermissibly suggestive." *Id.*

Here, the Court of Appeal reviewed the photographs and found that "all of the individuals depicted in the lineup are Hispanic males in their late teens or early twenties." Lodged Doc. 5, at 8. Further, "[a]ll are wearing a solid color shirt and none has distinguishing features such as tattoos or scars." *Id.* The Court of Appeal also determined that "[a]nother photograph in the group shows a man in approximately the same weight range." *Id.*

Third, Petitioner's claim that the lineup was improper because the victim was "heavily medicated" when he reviewed it also fails. Pet'r's Second Am. Pet. Ex. A, at 40. The Court of Appeal reasonably determined that "[w]hile the victim's impaired physical and mental condition at the time of the identification might be a factor a jury could consider in assessing its reliability, it has no impact on the *suggestiveness of the identification procedure* employed by the police . . . ." Lodged Doc. 5, at 9; *see Colorado v. Connelly*, 479 U.S. 157, 164 (1986) ("Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law."). If the flaws in the pretrial identification procedures are not so suggestive as to violate due process, "the reliability of properly admitted eyewitness identification, like the credibility of the other parts of the prosecution's case is a matter for the jury." *Foster*, 394 U.S. at 443 n.2; *see also Manson v. Brathwaite*, 432 U.S. 98, 116 (1977) ("Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature.").

Since the challenged procedure was not impermissibly suggestive, the due process inquiry ends. *Bagley*, 772 F.2d at 493. The Court of Appeal's rejection of this claim was neither contrary to, nor an unreasonable application of, clearly established law, and Petitioner is not entitled to relief on this claim.

B.  Ground Two:  Gang Evidence

In ground two, Petitioner argues he was "denied due process and a fair trial when the trial court, over defense objection, admitted gang evidence in this case."  Pet'r's Second Am. Pet. Ex. A, at 51.  Specifically, Petitioner argues that his statements, "14," "Northside," and "I'm going to bang on someone tonight," were "[t]he only pieces of evidence that might have connected [Petitioner] to a gang."  *Id.* at 54.  Petitioner asserts, however, "there was no gang motive for the shooting, and . . . it certainly cannot be argued that gang evidence was relevant to prove the gunman's motive."  *Id.* at 56.  Petitioner also contends that "because there was such a dearth of evidence connecting [Petitioner] with gangs in this case, the presentation of 'gang expert' evidence in this case amounted to the improper use of 'profiling' evidence that has been condemned by both state and federal courts in this country."  *Id.* at 58 (citations omitted).

1.  State Court Decision

The California Court of Appeal rejected this claim, stating:

> Prior to trial, the People filed a motion in limine to admit the expert testimony of Detective Aguilar regarding the psychology and sociology of the Norteno and Sureno street gangs in the Sacramento area.  The trial court ruled that the testimony was admissible, overruling [Petitioner's] objection that it was more prejudicial than probative under Evidence Code section 352.

> Aguilar, an investigator of gang-related crimes and detective in the Sacramento County Sheriff's Department gang suppression unit, testified that there are two major Hispanic gangs in California -- the Nortenos, who are from the Northern half of the state, and the Surenos, who hail from the Southern half.  Nortenos affiliate themselves with the color red and the number 14, since N is the fourteenth letter of the alphabet.  Surenos associate themselves with the color blue and the number 13.  Gang members usually wear something associated with their color.  Nortenos may make signs with their hands that signify the number 14.

> A Norteno who makes references to "Northside" is referring to his own territory.  Answering a hypothetical question, Detective Aguilar opined that a[] Hispanic male wearing a red sweatshirt who confronts another Hispanic male wearing blue and says the words "14" and "Northside" is conveying his membership in the Norteno gang.  If the confronted person laughs or walks away, the Norteno would take it as an insult, because he is not getting

respect; consequently, "he needs to take care of that."

Detective Aguilar noted the possibility that a youth may be affiliated with or aspire to be a member of a gang without being a "validated" member of the gang, i.e., one who satisfies several criteria promulgated by law enforcement agencies.  These aspiring youths "hang around until they are ready to prove themselves or they are jumped into a gang."  One way a youth can be "jumped into" a gang is to commit a crime or "take care of some business that the gang needs to have done."  Gangs use the expression to "bang on" somebody to mean they are going to take care of some business or shoot somebody.

[Petitioner] contends there was "no valid reason" to admit Detective Aguilar's testimony because "[t]here was no evidence presented that [Petitioner] was a gang member or was connected to gangs in any way."  We disagree.

California law permits a person with special knowledge, skill, experience, training or education in a particular field to qualify as an expert witness and to give testimony in the form of an opinion.  Such testimony is admissible if its subject matter is "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact."  (§ 801, subd. (a).)  "The subject matter of the culture and habits of criminal street gangs" meets the "criterion" for admissibility of expert testimony under section 801.  (*People v. Gardeley* (1996) 14 Cal.4th 605, 617[,] [59 Cal. Rptr. 2d 356, 927 P.2d 713]; see *People v. Williams* (1997) 16 Cal.4th 153, 196[,] [66 Cal. Rptr. 2d 123, 940 P.2d 710]; *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1369-1370[,] [37 Cal. Rptr. 2d 596].)

Here, [Petitioner's] objection was based not on relevance but prejudice under section 352.  That section provides, in relevant part, that "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice, of confusing the issue, or of misleading the jury."  (§ 352, subd. (b).)  "Prejudice for purposes of Evidence Code section 352 means evidence that tends to evoke an emotional bias against the defendant with very little effect on issues . . . ."  (*People v. Crew* (2003) 31 Cal.4th 822, 842[,] [3 Cal. Rptr. 3d 733, 74 P.3d 820].)  "'"Prejudicial' is *not* synonymous with 'damaging.'"'"  (*People v. Coddington* (2000) 23 Cal.4th 529, 588[,] [97 Cal. Rptr. 2d 528, 2 P.3d 1081] (italics added).)

The admission of gang evidence over a section 352 objection will not be disturbed on appeal unless the trial court's decision "exceeds the bounds of reason."  (. . . *Olguin*, *supra*, 31 Cal.App.4th at p. 1369.)  If there exists a reasonable or even fairly debatable justification for a trial court's exercise of discretion, the action will not be set aside on appeal.  (*People v. Crandell* (1988)

46 Cal.3d 833, 863[,] [251 Cal. Rptr. 227, 760 P.2d 423].)

The trial court properly admitted Detective Aguilar's testimony to explain [Petitioner's] behavior when [Petitioner] initially confronted Ramirez.  On the evening in question, [Petitioner] was wearing a red sweatshirt; an employee who had seen him in the store on prior occasions testified that he wore "a lot of red." [Petitioner's] hand signals, his references to "14" and "Northside," and his pledge that he was going to "bang on" somebody before confronting Ramirez were consistent with Aguilar's elucidation of the Norteno gang culture and mentality.  Consequently, expert testimony was highly probative on the issues of [Petitioner's] intent and motive in committing what otherwise might appear to be a senseless street shooting.  (See . . . Williams, supra, 16 Cal.4th at p. 193; People v. Champion (1995) 9 Cal.4th 879, 922[,] [39 Cal. Rptr. 2d 547, 891 P.2d 93].)

While it is true, as Detective Aguilar conceded, that according to records of local law enforcement agencies, [Petitioner] was not an official gang member, this is far from dispositive.  One need not be a card-carrying member of a street gang to parrot its lingo and mimic its behavior.  [Petitioner's] words and actions, as illuminated by Aguilar's expert testimony, suggested that he was a Norteno wannabe, seeking to prove he was worthy of entry into the gang by shooting someone who showed him disrespect and intruded on its territory.

Taking a different tack, [Petitioner] claims that "[w]hile it might be arguable that gang evidence was relevant to demonstrate [Petitioner's] motive in approaching Ramirez at the Circle K, it certainly cannot be argued that gang evidence was relevant to prove the gunman's motive in shooting Ramirez hours later. Ramirez, in his drunken state, obnoxiously provoked the shooter, and that was the sole reason for the shooting."  (Italics added.)  The argument is unsound.

First, the argument assumes there was no evidence that the man who approached Ramirez in front of the Circle K and the one who shot him on the street were the same person.  Two witnesses testified otherwise:  namely, Felipe and the victim himself. Furthermore, after the initial encounter at the Circle K, [Petitioner] was observed by neighbors who testified they saw [Petitioner] outside the Netzahauls' apartment, screaming at Ramirez and the Netzahauls.  Thus, there was a clear nexus between the two confrontations.

Second, [Petitioner's] attempt to separate the two incidents as gang and non-gang related improperly views the record in a light most favorable to himself.  He overlooks Ramirez's testimony that the man who confronted him on the street identified himself as a member of a gang, told Ramirez that he was "in his territory," and

warned him to go back to his house or [Petitioner] would kill him. This testimony was lent credibility by the account of independent eyewitnesses, who testified the hooded assailant warned Ramirez to "back the fuck up" before shooting him. [Petitioner's] actions on the street were not only consistent with his conduct in front of the Circle K but also with his prior statement that he was going to "bang on" somebody. Detective Aguilar's explanation of gang culture was thus critical to an understanding of [Petitioner's] motives and behavior on the night of the shooting. (*People v. Valdez* (1997) 58 Cal.App.4th 494, 506[,] [68 Cal. Rptr. 2d 135] [admission of expert testimony proper when used to educate the trier of fact "concerning territory, retaliation, graffiti, hand signals, and dress"]; *People v. Funes* (1994) 23 Cal.App.4th 1506, 1518[,] [28 Cal. Rptr. 2d 758] [prosecution may "introduce evidence of gang affiliation and activity where such evidence is relevant to an issue of motive or intent"].) The trial court did not abuse its discretion in finding that the probative value of Aguilar's testimony substantially outweighed its prejudicial effect.

We reject [Petitioner's] final argument that the use of expert testimony here amounted to "'profiling'" evidence, which has been condemned by state and federal courts. Contrary to [Petitioner's] suggestion, this case bears no resemblance to *People v. Castaneda* (1997) 55 Cal.App.4th 1067, [64 Cal. Rptr. 2d 395,] a case in which a[] Hispanic defendant was charged with heroin possession, and the prosecution's expert testified that "'*the typical heroin dealer is usually [a] Hispanic male adult*,'" and "'in my opinion, . . . the tar heroin market in Northern San Diego County particularly in these two cities *is controlled by Hispanics*.'" (*Id.* at p. 1072, some italics omitted.) The court held that this racially charged testimony was "'inherently prejudicial'" and should have been excluded. (*Ibid.*)

Here, both the victim and [Petitioner] were Hispanic. The inference of gang affiliation was not based on [Petitioner's] race -- it was based on his dress, words and gestures. The admission of Detective Aguilar's testimony did not invite the jury to convict [Petitoner] based on "profile" evidence.

Lodged Doc. 5, at 10-16 (footnote omitted).

2. Analysis of Gang Evidence Claim

The admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated, or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999) ("Even where it appears that

31

evidence was erroneously admitted, a federal court will interfere only if it appears that its admission violated fundamental due process and the right to a fair trial."); *Spivey v. Rocha*, 194 F.3d 971, 977 (9th Cir. 1999) ("It is well settled that a state court's evidentiary ruling, even if erroneous, is grounds for federal habeas relief only if it renders the state proceedings so fundamentally unfair as to violate due process"); *Jeffries v. Blodgett*, 5 F.3d 1180, 1192 (9th Cir. 1993) ("Habeas relief is available for wrongly admitted evidence only when the questioned evidence renders the trial so fundamentally unfair as to violate federal due process.").  Failure to comply with state rules of evidence is neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds.  *See Henry*, 197 F.3d at 1031; *Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991).

The due process inquiry in federal habeas review is whether the admission of evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair.  *See Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995).  "Only if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process.  Even then, the evidence must 'be of such quality as necessarily prevents a fair trial.'"  *Jammal*, 926 F.2d at 920; *see also Estelle*, 502 U.S. at 70 (holding admission of evidence "relevant to an issue in the case" does not violate due process).

In this case, there were permissible inferences that the jury could draw from the gang evidence.  Courts have allowed evidence of gang affiliation when it is relevant to material issues in a case.  *See United States v. Abel*, 469 U.S. 45, 49 (1984) (bias); *United States v. Hankey*, 203 F.3d 1160, 1171-73 (9th Cir. 2000) (bias and coercion); *Windham v. Merkle* 163 F.3d 1092, 1103-04 (9th Cir. 1998) (motive); *United States v. Easter*, 66 F.3d 1018, 1021 (9th Cir. 1995) (identity); *Unites States v. Santiago*, 46 F.3d 885 (9th Cir. 1995) (motive).  Here, gang evidence was introduced to establish motive for the otherwise inexplicable and unprovoked shooting. *Windham*, 163 F.3d at 1103-04 (holding evidence of gang practices properly admitted even though "[n]o evidence was introduced that [Petitioner] was a member of the Crips").

1    Moreover, the Ninth Circuit has held that "there is no clearly established constitutional

2    right to be free of expert opinion on an ultimate issue." *Briceno v. Scribner*, 555 F.3d 1069,

3    1077-78 (9th Cir. 2009) (holding admission of police gang investigator's expert testimony in

4    support of criminal street gang enhancement did not violate habeas petitioner's due process or

5    fair trial rights).  "Although '[a] witness is not permitted to give a direct opinion about the

6    defendant's guilt or innocence . . . . an expert may otherwise testify regarding even an ultimate

7    issue to be resolved by the trier of fact.'" *Moses v. Payne*, 555 F.3d 742, 761 (9th Cir. 2009)

8    (quoting *United States v. Lockett*, 919 F.2d 585, 590 (9th Cir. 1990)).  "That the Supreme Court

9    has not announced such a holding is not surprising, since it is 'well-established . . . that expert

10   testimony concerning an ultimate issue is not per se improper.'" *Id.* (quoting *Hangarter v.*

11   *Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004)).

12       The admission of gang evidence was not contrary to, or an unreasonable application of,

13   Supreme Court law.  Petitioner is not entitled to federal habeas relief on this claim.  28 U.S.C. §

14   2254(d).

15       C.  Ground Three:  Cumulative Error

16       In ground three, Petitioner argues that the cumulative effect of errors in the first and

17   second grounds violated his constitutional due process rights.  Pet'r's Second Am. Pet. Ex. A, at

18   63-64.

19       "Cumulative error occurs when although no single trial error examined in isolation is

20   sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors [has] still

21   prejudice[d] a defendant." *Wooten v. Kirkland*, 540 F.3d 1019, 1022 n.1 (9th Cir. 2008) (quoting

22   *Whelchel v. Washington*, 232 F.3d 1197, 1212 (9th Cir. 2000)) (internal quotation marks

23   omitted).  A court "must ask whether the aggregated errors so infected the trial with unfairness as

24   to make the resulting conviction a denial of due process." *Jackson v. Brown*, 513 F.3d 1057,

25   1085 (9th Cir. 2008) (quoting *Parle v. Runnels*, 387 F.3d 1030, 1045 (9th Cir. 2004)) (internal

26   quotation marks omitted).  "[W]here there is no single constitutional error existing, nothing can

33

1   accumulate to the level of a constitutional violation." *Fuller v. Roe*, 182 F.3d 699, 704 (9th Cir.

2   1999), *overruled on other grounds by Slack v. McDaniel*, 529 U.S. 473 (2000).

3          Here, the Court of Appeal properly held that "the record has disclosed no error warranting

4   reversal, whether considered separately or cumulatively." Lodged Doc. 5 at 16.  Because no

5   single constitutional error exists, no errors can accumulate to the level of a constitutional

6   violation.  Petitioner is not entitled to relief on this claim.

7                                    VII.  CONCLUSION

8          For the foregoing reasons, IT IS HEREBY ORDERED that Petitioner's request for

9   appointment of counsel is DENIED.

10         IT IS HEREBY RECOMMENDED that:

11         1.  Petitioner's application for writ of habeas corpus be DENIED;

12         2.  Petitioner's August 16, 2006 stay-and-abeyance motion be DENIED as moot; and

13         3.  Petitioner's September 16, 2008 request for what may be construed as either a stay-

14   and-abeyance motion or a motion to amend be DENIED.

15         These findings and recommendations are submitted to the United States District Judge

16   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within twenty-one

17   days after being served with these findings and recommendations, any party may file written

18   objections with the court and serve a copy on all parties.  Such a document should be captioned

19   "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

20   shall be served and filed within seven days after service of the objections.  Failure to file

21   objections within the specified time may waive the right to appeal the District Court's order.

22   *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1156-57

23   (9th Cir. 1991).  In any objections he elects to file, Petitioner may address whether a certificate of

24   appealability should be issued in the event he elects to file an appeal from the judgment in this

25   ///

26   ///

case. *See* Rule 11(a), Federal Rules Governing Section 2254 Cases (district court must issue or deny certificate of appealability when it enters final order adverse to applicant).

DATED:        November 23, 2010.



TIMOTHY J BOMMER
UNITED STATES MAGISTRATE JUDGE

35